**[J-54-2018] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 743 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated February |
| | : | 14, 2017 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| v. | : | Division at Nos. CP-51-CR-0400131- |
| | : | 1997 and CP-51-CR-0703121-1997. |
| | : | |
| RICARDO NATIVIDAD, | : | SUBMITTED: July 19, 2018 |
| | : | |
| Appellant | : | |

**DISSENTING OPINION**

**JUSTICE WECHT**                                    **DECIDED: January 23, 2019**

Ricardo Natividad, a capital litigant, appeals from an order dismissing his third petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. Today's learned Majority affirms the PCRA court's order, denying relief on all five issues that Natividad raises. I agree with the Majority's thoughtful disposition of three of these issues: that Natividad's claim based upon the "Maculla" note was untimely; that this Court is precluded from exercising jurisdiction over Natividad's challenge to the constitutionality of 42 Pa.C.S. § 9711(d)(9); and that the PCRA court properly exercised its discretion in denying Natividad's discovery request.

However, because the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it withheld evidence from multiple sources that Rupert Robinson confessed to the murder for which Natividad was convicted and sentenced to death (hereinafter "the Robinson documents"), I respectfully dissent. While it is not unreasonable for the Majority

to characterize the materiality of the Robinson documents as a "close call,"[1] my evaluation of both the record and the principles upon which *Brady* and its progeny are based leads me to conclude that this undisclosed evidence was material to Natividad's case. In light of this conclusion, and the concomitant requirement of a new trial,[2] I would not reach Natividad's final issue, in which he asserts prejudice occasioned by the cumulative effect of the Commonwealth's *Brady* violations.

On November 10, 1997, Natividad was convicted of, *inter alia*, first-degree murder for the November 9, 1996 carjacking of Michael Havens and the subsequent fatal shooting of Robert Campbell. Natividad was sentenced to death. On direct appeal, by way of a plurality opinion, this Court affirmed Natividad's judgment of sentence. *Commonwealth v. Natividad*, 773 A.2d 167 (Pa. 2001) (Opinion Announcing Judgment of the Court). Over the course of the next ten years, Natividad filed two PCRA petitions, both of which were denied. Natividad then filed a petition for writ of *habeas corpus* in federal court. In that proceeding, Natividad sought and received discovery from the Commonwealth, which yielded previously undisclosed exculpatory evidence. On August 9, 2012, Natividad filed the instant PCRA petition, and subsequently sought leave to amend that petition after additional production of discovery revealed the previously undisclosed Robinson documents.

Because the Majority faithfully and comprehensively summarizes the Robinson documents, there is no need for me fully to reproduce their contents here. *See* Majority Opinion at 9-14 (citing Natividad's Supplement to Third PCRA Petition, 10/6/2014). Nevertheless, some particularly compelling portions bear repetition. On November 14,

---

[1] Majority Opinion at 31.

[2] *See Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016) (*per curiam*); *Kyles v. Whitely*, 514 U.S. 419, 422 (1995).

1996, Joseph Rutherford provided a statement to police detailing an interaction with Robinson that occurred on November 11, 1996. According to Rutherford, while arguing over a drug debt, Robinson threatened to kill Rutherford and stated that "he would do me like he did Bob down at the gas station." Natividad's Supplement to Third PCRA petition, 10/6/2014, Exh. 1 at 4. On November 13, 1996, prior to giving his official statement to the police, Rutherford told Officer Rita Wilson, while she was responding to an altercation at a bar, that Robinson said to him, "we're going to do to you what we did to the guy at 63rd and Vine." *Id.*, Exh. 8 at 2.

On November 14, 1996, Cynthia Smith also gave a statement to police. Smith stated that Robinson alerted her to the Campbell murder shortly after it occurred. She stated that Robinson came to her house, turned on the news, and asked, "Didn't you hear about the guy getting shot — down at the gas station. You know the guy — the fucking snitch — that town watch guy Bobby Campbell." *Id.*, Exh. 2 at 2. On November 13, 1996, Smith asked Robinson if he was involved in the shooting, to which Robinson responded, "Yeah, I did it," and further stated, "That's what happens to snitches." *Id.* at 3-4. Robinson placed himself at the gas station shortly after the shooting and stated that he saw Campbell on the ground bleeding and that he observed a gun in a holster on Campbell's waist. *Id.*, Exh. 3 at 2-3.

In his amended petition at issue herein, Natividad argued that Rutherford's and Smith's statements and the police investigatory files indicated that "another person . . . confessed he committed the crime for which [Natividad] has been convicted and sentenced to death." *Id.* at 3. Natividad claimed that, in violation of *Brady*, the "Commonwealth withheld evidence of another highly investigated suspect," who was also the "confessed killer of the victim." *Id.* at 5. Natividad contended that "there is a reasonable probability of a different outcome in this trial if the Commonwealth had timely

produced the evidence that [Robinson] confessed to shooting and killing the victim." *Id.* at 12. The PCRA court denied relief.

In order to establish a *Brady* violation, a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Critically, in analyzing whether there is a reasonable probability that the result would have been different, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Moreover, and of crucial import herein, this Court has recognized that *Brady*'s materiality assessment extends to consideration of "the defendant's ability to investigate alternate defense theories and to formulate trial strategy." *Commonwealth v. Ly*, 980 A.2d 61, 76 (Pa. 2009). *See also Commonwealth v. Green*, 640 A.2d 1242, 1245 (Pa. 1994) (holding that courts may "consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well"). In *Commonwealth v. Willis,* 46 A.3d 648 (Pa. 2012) (Opinion Announcing the Judgment of the Court), we reinforced this concept:

> [N]ondisclosed favorable evidence which is not admissible at trial may nonetheless be considered material for *Brady* purposes where the

Commonwealth's failure to disclose such evidence adversely affected the presentation of the defense at trial, or the defense's preparation for trial, such that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*Id.* at 670.

The Commonwealth argues that the leads and information contained in the Robinson documents amount merely to a "collection of recycled gossip that surfaced during the first week after the murder," and therefore are not material. Brief for Commonwealth at 33. The Majority appears to agree, concluding that the Robinson documents "largely derive from a single event: the dispute over Robinson's collection of drug debts," and that most of the withheld material either "merely document[s] the dispute between Rutherford and Robinson or regurgitate[s] Rutherford's and Smith's claims [that] Robinson confessed to being the killer." Majority Opinion at 35.

I do not dispute that, to some extent, the withheld materials include the same information echoing off of, or repeated by, multiple sources. Nonetheless, it is erroneous to overlook or minimize the significance of the fact that a third party, Robinson, confessed to two different people, on separate occasions, to being the perpetrator of the crime for which Natividad ultimately was charged and convicted. I cannot agree that such evidence is, as the majority concludes, "'too weak, or too distant from the main evidentiary points to meet *Brady*'s standards.'" *Id.* at 34-35 (quoting *Turner v. United States*, 137 S.Ct. 1885, 1894 (2017)). To the contrary, I view this evidence as compelling, inasmuch as it strikes right at the heart of this case.

As noted, and as must be emphasized, Natividad is not required to prove that, had the suppressed material been disclosed, he would have prevailed at trial. To establish *Brady* materiality, a defendant is not required to shoulder such a surpassingly formidable burden. The defendant must prove only that, due to the Commonwealth's suppression

of evidence, he was denied a fair trial, understood as a trial resulting in a verdict not worthy of confidence.  *See Kyles*, 514 U.S. at 434.  In my view, Natividad has done so.

Although it recites the proper standards as a general matter, the Majority appears ultimately not to apply those standards here.  Instead, the Majority engages in something more closely resembling a sufficiency analysis.  After a thorough summary of both the evidence presented by the Commonwealth inculpating Natividad and the content of the withheld Robinson materials, the Majority concludes that the "Commonwealth's evidence against [Natividad] was so overwhelming there is no reasonable probability that if the Commonwealth had turned over the relevant evidence the result of the trial would have been different."  Majority Opinion at 31 (citing PCRA Ct. Op., 8/9/2017, at 8-9).  The Majority thus implies incorrectly that, for *Brady* purposes, Natividad was required to demonstrate that, as *Kyles* phrased it, "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."  *Kyles*, 514 U.S. at 434-45 (rejecting this argument, and reminding that *Brady* "is not a sufficiency of the evidence test").  *See id.* at 445 n.8 (refuting the suggestion that "[the defendant] must lose because there would still have been adequate evidence to convict even if the favorable evidence had been disclosed").[3]

---

[3]     The Majority maintains that, as required by *United States v. Agurs*, 427 U.S. 97 (1976), it considered the suppressed evidence in the context of the entire record and that, "'[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.'"  Majority Opinion at 32 (quoting *Agurs*, 427 U.S. at 112-13).  This is not the appropriate standard for determining materiality under *Brady*.  In *Kyles*, decided nearly twenty years after *Agurs*, the Supreme Court of the United States synthesized its decisions applying the *Brady* materiality standard, and emphasized that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)."  *Kyles*, 514 U.S. at 434.  Explicitly rejecting the notion that *Brady* materiality is grounded in the sufficiency of the evidence, the *Kyles* Court stated that the "possibility of acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict."  *Id.* at 435.

Moreover, the Majority appears to discount the exculpatory statements of Rutherford and Smith, emphasizing that Rutherford and Smith offered their statements to police after Robinson repeatedly threatened Rutherford. *See id.* at 35. Credibility considerations fall outside the purview of an appellate court. Questions of credibility, bias, or motive to testify are assigned to the factfinder. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 301 (3d Cir. 2016) ("The jury makes the credibility determination, not the Court sixteen years post-trial.").[4]

Perhaps most troubling is the Majority's speculation as to the effect that the withheld evidence would have had on the case as it was presented twenty-one years ago. The Majority fails to give adequate attention to Natividad's argument that his *defense strategy* would have been altered significantly had he been armed with the suppressed

While the Majority finds my discussion of the precedents "perplexing," *see* Majority Opinion at 36 n.17, the point is not that *Agurs* has been overruled outright (it has not), but rather that its comment on reasonable doubt in the context of *Brady* materiality has been clarified authoritatively, particularly by *Kyles*. *Cone v. Bell*, 556 U.S. 449 (2009) and *Turner*, which the Majority invokes in an apparent effort to avoid *Kyles'* implications for this case, did not alter the governing materiality standard.

[4]     The Majority notes, and I certainly agree, that decisions of federal courts of appeal are not binding on this Court. Nevertheless, in this instance, *Dennis* proves to be particularly instructive. In *Dennis*, the United States Court of Appeals for the Third Circuit, reviewing this Court's order upholding Dennis' conviction in the context of a federal *habeas corpus* challenge, chastised this Court because this Court "did precisely what the *Strickler* Court rejected—it evaluated whether, after considering [the suppressed evidence], the remaining eyewitness testimony was sufficient for Dennis's conviction." *Dennis*, 834 F.3d at 304. This is essentially the same malady that afflicts the Majority's reasoning here. *See* Majority Opinion at 35 ("[W]hatever evidentiary value the material regarding Robinson may have in its own right, it does nothing to weaken the main evidentiary points raised at trial."). The Majority's retrospective sufficiency test is directly at odds with the United States Supreme Court's explicit rejection of such an approach, an approach which presumes that, because the *Brady* material "can be logically separated from the incriminating evidence that would have remained unaffected[,]" the defendant must lose. This is not the state of the law. *See Kyles*, 514 U.S. at 435 n.8 (rejecting the argument that the defendant could not prevail because, even if the favorable evidence had been disclosed, there still would have been adequate evidence left to convict).

exculpatory evidence. Natividad maintains that the "entire course of the defense would have been changed" had the Commonwealth disclosed the evidence of Robinson's confession. Brief for Natividad at 42. Natividad notes that:

> [a]lthough there was no forensic evidence connecting [Natividad] to the crime, and [Natividad] had never made any inculpatory statement to the police, counsel had no evidence to suggest that anyone other than [] Natividad had committed the offense. Thus, counsel chose to raise a self-defense case, based on Price's testimony that the deceased had drawn his weapon. This defense was necessarily weak as the deceased was found with his weapon holstered and snapped shut.

*Id.* at 41-42. After reviewing the entire record carefully, I agree.

Not only is there a reasonable probability that the result of the proceeding would have been different — the proceeding *itself* would likely have been much different. Quite simply, an entirely different defense strategy, naming Robinson as the perpetrator, would have been available to Natividad, a strategy that had a much better chance of success than the facially weak self-defense claim. It is worth reiterating that Natividad is not required to prove that he would have been acquitted had he advanced an alternative perpetrator theory based upon the suppressed evidence. Rather, Natividad need demonstrate only that, deprived of that evidence, he did not receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The Commonwealth's suppression of evidence that Robinson confessed to the Campbell murder (a confession made to two different people, on separate occasions) deprived Natividad of the opportunity to advance a defense theory more credible and viable than the one he pursued at trial.[5]

---

[5] See *Turner*, 137 S.Ct. at 1898 (Kagan, J., dissenting) ("The defendants didn't offer an alternative perpetrator defense because the Government prevented them from learning what made it credible. . . . Without the withheld evidence, each of the defendants had little choice but to accept the Government's framing of the crime[.]").

In its entirety, Natividad's case in chief consisted of one witness, whose testimony spans only eight pages of transcript. *See* N.T., 11/10/1997, at 9-16. Seeking to undercut the reliability of Michael Havens' description of the man who carjacked him, trial counsel presented Officer Brian James, who testified about Havens' initial statement given to police following the robbery and carjacking. Officer James testified that Havens did not indicate that the carjacker was wearing a jacket. In a later, more detailed, statement, Havens described the man sitting in the passenger seat pointing a gun at him as wearing a long, black leather jacket. Related to the Campbell murder, Natividad offered no evidence in his own case in chief in support of any defense theory; self-defense, alternative shooter, or otherwise.

Overall, it is somewhat unclear what Natividad's defense strategy actually was. In his opening, trial counsel maintained that Natividad was not involved in the carjacking or murder. *See* N.T., 11/5/1997, at 144. Nevertheless, in response to Price's testimony, trial counsel sought, and received, a jury instruction on self-defense. Curiously, however, trial counsel attempted to discredit Price on cross-examination. Trial counsel questioned Price's lack of knowledge that Natividad was carrying a gun on the night of the murder and challenged Price's recollection of which gas pump Natividad had pulled alongside at the gas station. N.T., 11/6/1997, at 24-25, 30, 34-35. Trial counsel also questioned Price's initial failure to admit his involvement to police, even when officers warned him that he was a suspect. *Id.* at 39-47. Finally, on cross-examination, Price testified that he told police that Natividad was carrying a .38 Special revolver, but also admitted that his description did not include the distinctive black grips that adorned the .357 Magnum recovered from Keith Smith's lawyer. *Id.* at 66-67.[6]

---

[6]     Interestingly, neither the Commonwealth nor Natividad's trial counsel asked Price what Natividad was wearing on the night of the Campbell murder. Considering that the "lumberjack style" jacket was a key piece of evidence supporting the Commonwealth's

In his closing statement, defense counsel reiterated the inconsistencies in Price's testimony and implied that Price had a motive to inculpate Natividad in order to minimize his own involvement. N.T., 11/10/1996, at 34-38. Trial counsel additionally concluded in his summation that the Commonwealth failed to prove beyond a reasonable doubt that Natividad was the perpetrator of either the carjacking or the murder, arguing that the Commonwealth's case was based upon speculation and gossip on the street. *Id.* at 40-42.

In his closing, trial counsel never mentioned self-defense, presumably because such a theory was significantly undercut by the testimony that Campbell's gun was found snapped into its holster, clearly not drawn during the altercation. Arguably, these inconsistent approaches throughout trial could have been more damaging to Natividad's case than presentation of a coherent, albeit weak, theory of self-defense. It is, of course, never the defense's burden to convince the jury of a defendant's innocence. Nonetheless, the absence of a coherent defense strategy or any meaningful proffer of evidence favorable to the defense serves to highlight the barren evidentiary landscape upon which trial counsel apparently felt compelled to base his case.

This observation serves as well as the backdrop for comparing the case actually presented to the case the defense could have developed had it been equipped with the evidence suppressed by the Commonwealth. By suppressing the Robinson documents, the Commonwealth became the "architect" of Natividad's trial, usurping the defense's right to present the defense theory of its own choice, hamstringing the defense by limiting its strategy to an attempted discrediting of Commonwealth witnesses and a half-hearted endorsement of a feeble self-defense theory. *See Brady*, 373 U.S. at 87-88 ("A

---

theory that the perpetrator of the Havens carjacking and the perpetrator of the Campbell murder were one and the same person, it is curious that a key Commonwealth witness would not be employed to establish this evidence probative of the perpetrator's identity.

prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice[.]"); *Commonwealth v. Chamberlain*, 30 A.3d 381, 402 (Pa. 2011) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) ("[The] Due Process Clause of the Fourteenth Amendment requires defendants be provided access to certain kinds of evidence prior to trial, so they may be 'afforded a meaningful opportunity to present a complete defense.'").

Armed with the suppressed Robinson documents, Natividad could have advanced a third party guilt theory, shifting the entire course of his trial defense. Instead, Natividad's trial counsel was forced to pursue contradictory theories, espousing Natividad's innocence and simultaneously advancing, albeit somewhat fitfully, a theory of self-defense. In precluding the trier of fact from hearing Robinson's confessions, the Commonwealth significantly impeded Natividad's preparation and presentation of his defense, denying Natividad "a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434. *See also Bagley*, 473 U.S. at 693 (Marshall, J., dissenting) ("The private whys and wherefores of jury deliberations pose an impenetrable barrier to our ability to know just which piece of information might make, or might have made, a difference.").

The Commonwealth asserts that Natividad's "*post hoc* evaluation" that an alternative perpetrator defense would have been preferable to a theory of self-defense "warrants skepticism." Brief for Commonwealth at 42-43. The Majority also concludes that "it is not enough, for purposes of establishing materiality under *Brady*, to simply allege that the withheld evidence may have opened the door to an otherwise unavailable defense theory." Majority Opinion at 39. That is an unfortunate oversimplification of what Natividad is doing. Natividad points to multiple pieces of specific evidence, suppressed

by the Commonwealth, which implicate a third party in the crime for which Natividad was charged and convicted. This is evidence which, in the hands of competent defense counsel, would have dramatically shifted the course of Natividad's defense. This is more than merely the identification of a possible theory. It is instead the exposure of a meaningful, substantial defense that would have given Natividad a much greater chance of success. The Commonwealth obscures the fact that, as a direct result of the Commonwealth's suppression, Natividad now is consigned to the position of having to speculate.

It is largely the responsibility of prosecutors to make the initial pre-trial determination of the materiality of exculpatory evidence. If we permit prosecutors to speculate prospectively about the effect that nondisclosed favorable evidence may have on a future jury — or judge for themselves the credibility of such evidence behind closed doors — we cannot at the same time limit the defense's ability to speculate retrospectively about how that same evidence, suppressed by the Commonwealth, may have affected the jury deliberations. The inequities are patent: we deny relief to, or scold, the defense for speculating in circumstances where it was the Commonwealth's affirmative decision to suppress evidence that now precipitates the necessity for such speculation. This whipsaw approach encourages the prosecution to withhold evidence that may support a potential defense theory in the hope that the defense will not raise that theory at trial. If the evidence subsequently comes to light, the Commonwealth then simply can maintain that the evidence is not material under *Brady* because the defendant now is merely speculating as to the effect that undisclosed evidence would have had on trial counsel's preparation or presentation of the case. Perhaps I am misguided in feeling that such a peculiar state of affairs is evocative of *Alice in Wonderland*; regardless, it certainly undermines the entire foundation of *Brady*.

Justice Thurgood Marshall, joined by Justice William Brennan, cautioned against endorsement of this version of prosecutorial discretion:

> At best, [the materiality standard] places on the prosecutor a responsibility to speculate, at times without foundation, since the prosecutor will not normally know what strategy the defense will pursue or what evidence the defense will find useful. At worst, the standard invites a prosecutor, whose interests are conflicting, to gamble, to play the odds, and to take a chance that evidence will later turn out not to have been potentially dispositive.

> \*   \*   \*

> The Court's standard also encourages the prosecutor to assume the role of the jury, and to decide whether certain evidence will make a difference. In our system of justice, that decision properly and wholly belongs to the jury. The prosecutor, convinced of the guilt of the defendant and of the truthfulness of his witnesses, may all too easily view as irrelevant or unpersuasive evidence that draws his own judgments into question. Accordingly he will decide the evidence need not be disclosed. But the ideally neutral trier of fact, who approaches the case from a wholly different perspective, is by the prosecutor's decision denied the opportunity to consider the evidence. The reviewing court, faced with a verdict of guilty, evidence to support that verdict, and pressures, again understandable, to finalize criminal judgments, is in little better position to review the withheld evidence than the prosecutor.

*Bagley*, 473 U.S. at 702 (Marshall, J., dissenting).

The Supreme Court of the United States has emphasized that "a prosecutor anxious about tacking too close to the wind" should "disclose a favorable piece of evidence" and "resolve doubtful questions in favor of disclosure." *Kyles*, 514 U.S. at 439 (citing *Agurs*, 427 U.S. at 108). Herein, that warning went unheeded by the Commonwealth, which now contends that the Robinson documents merely contained "gossip circulating in early November 1997 among a group of people who did not witness the murder and had scores to settle with Robinson," and which asserts now that the police investigation ultimately determined that Robinson was not involved in the Campbell murder. Brief for Commonwealth at 42. The Commonwealth also maintains that the

prosecution is not required to disclose every "fruitless lead" followed by investigators. *Id.* at 27 (quoting *Commonwealth v. Crews*, 640 A.2d 395, 406 (Pa. 1994)).

This "fruitless lead" language is not grounded in precedent from the Supreme Court of the United States. It made its first appearance in this Court's jurisprudence in *Crews*, a case that centered upon a violation of former Pennsylvania Rule of Criminal Procedure 305(B)(1)(a), which required prosecutors to disclose to the defendant any exculpatory information material to the defense. The defendant in *Crews* did not raise a constitutional challenge under *Brady*. Nevertheless, over time, this limitation upon a prosecutor's duty to disclose has become a mainstay in this Court's decisions applying *Brady*. *See, e.g., Commonwealth v. Paddy*, 15 A.3d 431, 450-51 (Pa. 2011); *Ly*, 980 A.2d at 75; *Commonwealth v. Lambert*, 884 A.2d 848, 857 (Pa. 2005). Such a rule significantly erodes the purpose and spirit of *Brady* and its progeny, precedents that are designed to ensure that a defendant receives a constitutionally fair trial.

Characterizing a lead as "fruitless" necessarily begs the question — "fruitless" to whom? And what makes a lead "fruitless?" That it does not inculpate the defendant or that it does not fit in the Commonwealth's theory of the case? Permitting the Commonwealth to make such a prospective determination based upon its own assessment of evidentiary value diverges from the goals of fairness and justice that underlie *Brady*. Justice Marshall addressed this incompatibility, highlighting that "[e]vidence that is of doubtful worth in the eyes of the prosecutor could be of inestimable value to the defense, and might make the difference to the trier of fact." *Bagley*, 473 U.S. at 698 (Marshall, J., dissenting). Additionally, Justice Marshall stressed that "it is the job of the defense, not the prosecution, to decide whether and in what way to use arguably favorable evidence." *Id. See also Kyles*, 514 U.S. at 440 ("[Disclosure] will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the

chosen forum for ascertaining the truth about criminal accusations."). The Third Circuit in *Dennis* also criticized this Court's narrowing of *Brady*'s protection: "There is no requirement that leads be fruitful to trigger disclosure under *Brady*, and it cannot be that if the Commonwealth fails to pursue a lead, or deems it fruitless, that it is absolved of its responsibility to turn over to defense counsel *Brady* material." *Dennis*, 834 F.3d at 306.

Additionally, the Commonwealth's position that disclosure was unnecessary because the Robinson documents contain unsubstantiated gossip is inconsistent with the Commonwealth's own reliance upon comparable evidence to convict Natividad. Rutherford's and Smith's statements indicating that Robinson confessed to the Campbell murder were of the same nature and quality as the statements of Natasha Catlett[7] and Robert Golatt[8] describing Natividad's inculpatory statements, which the Commonwealth used to bolster its case without concern for the reliability of that evidence. Moreover, the Majority includes the Catlett and Golatt statements in the "overwhelming and intact evidence of [Natividad]'s guilt" upon which it relies to conclude that an alternative defense theory would not have been a stronger defense for Natividad than that presented at trial. Majority Opinion at 37. I reject the premise advanced here, that the materiality of evidence of such similar nature and quality hinges upon whether it supports the Commonwealth's theory of the case, or whether the remaining evidence was sufficient to suggest Natividad's guilt. The Commonwealth discredits some exculpatory statements as mere street gossip far removed from *Brady*'s materiality standard, while

---

[7] Catlett testified for the Commonwealth that Natividad called her sometime after Christmas and "asked me if we could split the $10,000 reward, and he said that he wasn't going to beat around the bush and I know that he killed the man." N.T., 11/6/1997, at 155.

[8] Golatt testified that, a couple days after the Campbell murder, "[Natividad] said that he was in the car and he said that he was at the service station and some, you know, the guy drawed on him and he, you know, popped him first." N.T., 11/6/1997, at 165.

simultaneously bolstering its case against Natividad with other, inculpatory street gossip. It is difficult to take such a contradictory position seriously.

I criticize this approach "with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense" been privy to the suppressed evidence. *See Bagley*, 473 U.S. at 683. Such a determination is

> inherently speculative because one cannot tell with any certainty what effect the evidence would have had, precisely because the evidence was not introduced. The appellate court's review of 'what might have been' is extremely difficult in the context of an adversarial system. Evidence is not introduced in a vacuum; rather, it is built upon. The absence of certain evidence may thus affect the usefulness, and hence the use, of other evidence to which defense counsel does have access. Indeed, the absence of a piece of evidence may affect the entire trial strategy of defense counsel.

Daniel J. Capra, *Access to Exculpatory Evidence: Avoiding the* Agurs *Problem of Prosecutorial Discretion and Retrospective Review*, 53 FORDHAM L. REV. 391, 412 (Dec. 1984).

Even accounting for the suppressed Robinson materials, I concede readily and without equivocation that there might well be enough evidence remaining unscathed to sustain Natividad's conviction. But that is not our inquiry here. Not only is this not the proper materiality inquiry; it wholly ignores the fact that the jury would have been presented with an entirely different defense theory. That theory would have included perhaps the most exculpatory type of evidence — that another person confessed to the crime for which the defendant was charged.[9] Our role is not to scrutinize the contents of

---

[9] Contrary to the Majority's straw man argument, I do not here endorse a bright-line rule that "any withheld evidence that could be used to support a new defense theory is *Brady* material." *See* Majority Opinion at 40 n.19. As always, and critically, the materiality standard remains. *See Willis*, 46 A.3d at 670 (holding that evidence may be material for *Brady* purposes "where the Commonwealth's failure to disclose such evidence adversely affected the presentation of the defense at trial, or the defense's preparation for trial, such

the Robinson documents based upon the witness' motive or bias; that inquiry belongs to the jury. Unfortunately, the jury was "deprived of the ingredients necessary to a fair decision." *Bagley*, 473 U.S. at 694 (Marshall, J., dissenting). The Commonwealth's suppression of the Robinson documents, which, if disclosed, would have allowed Natividad to present a defense focused upon his claim of innocence while advancing an alternative perpetrator theory, deprived Natividad of a "fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

Based upon the controlling precedent and the evidence in this case, my confidence in the outcome has been undermined, and I deem the suppression of the Robinson documents to violate *Brady*. That violation demands redress, lest the rule of *Brady* come to be viewed in this Commonwealth as a mere suggestion without consequence. I respectfully dissent.

Justice Donohue joins this dissenting opinion.

---

that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). My analysis here is governed by the circumstances of this particular case.