# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 38
The People &c.,
   Appellant,
  v.
John Giuca,
   Respondent.

Leonard Joblove, for appellant.
Mark A. Bederow, for respondent.
National Association of Criminal Defense Lawyers, et al.; Center on the Administration of Criminal Law at New York University School of Law, amici curiae.

DiFIORE, Chief Judge:

   The question presented in this appeal is whether the People violated their obligations under Brady v Maryland (373 US 83 [1963]) by failing to disclose favorable impeachment material derived from the circumstances of a prosecution witness's pending burglary case

- 1 -

and whether the People failed to correct false or misleading testimony provided by the witness on that subject at trial. We hold that, to the extent there was any suppression of impeachment material, there is no reasonable possibility that the verdict would have been different if the information at issue had been disclosed.

In September 2005, defendant and his codefendant, Antonio Russo, were jointly tried before dual juries for the murder of Mark Fisher. The prosecution proceeded on theories of both intentional and felony murder. Relevant to this appeal, the majority of the People's witnesses, who were defendant's friends, testified that defendant made a series of incriminating statements, including that defendant believed the victim was "disrespecting" his home, that he supplied codefendant Russo with a gun for the purpose of robbing Fisher, that Russo intentionally shot and killed the victim, that defendant attempted to cover his role in the felony murder by asking his friends not to cooperate with the police, and that defendant arranged for the disposal of his gun after the crime.

In addition to defendant's inculpatory statements, the evidence at trial established that, after a night out in Manhattan, Fisher and several other individuals accompanied defendant to his Brooklyn home, arriving at about 4:00 a.m. on October 12, 2003. Thereafter, Russo accompanied Fisher to a nearby ATM where Fisher withdrew $20. Shortly after the two men returned to defendant's house, the gathering broke up and Fisher went to sleep on defendant's couch. At 6:40 am, Fisher was shot and killed. He was shot five times with a .22 caliber weapon – the same caliber gun that defendant owned prior to the shooting. Fisher's body was found a few blocks from defendant's house, on a

distinctive blanket that defendant's mother identified as one that came from her house. The individual who disposed of the gun for defendant testified at trial that, a day or two after the murder, defendant gave him a bag containing a black gun and, pursuant to an arrangement made by defendant, another individual later took the bag in exchange for money. Phone records were also introduced at trial, showing that defendant and Russo placed an unusual volume of calls to each other in both the hours leading up to and the days following the murder.

A different version of events was provided by a jailhouse informant, JA, who testified that defendant made certain admissions to him while they were both incarcerated on Rikers Island – including that defendant himself had participated in the robbery and beating of the victim.

During JA's direct testimony, the prosecutor elicited that the witness met defendant while incarcerated on a burglary charge, that he had since pleaded guilty to third-degree burglary and that he was sentenced to an 18- to 24-month drug treatment program. JA testified that he had a 13-year history of drug abuse and "quite a lengthy criminal history" dating back to 1989. The People elicited from JA his 15 individual prior convictions, mostly for larcenous crimes. When asked how he was progressing in his current drug program, JA responded that he was "doing good." The ADA then asked JA if he had relapsed during the drug program and he admitted to one relapse. JA denied that he ever requested or received any promise or benefit in exchange for his trial testimony.

On cross-examination, defense counsel elicited the following facts. JA entered the drug treatment program on April 28, 2005, as part of a conditional sentence in exchange for his guilty plea on his burglary case and that his next scheduled court appearance was October 6, 2005 – after his trial testimony. In fact, JA's negotiated guilty plea provided that if he successfully completed the drug treatment program, his burglary case would be dismissed, but if he failed the program, he faced a 3½- to 7-year prison term. JA had committed several violations since entering the treatment program, including absconding from the program on the night of June 9, 2005. Earlier that same day, JA had appeared in treatment court, where the judge reminded him that he faced state prison if he failed the drug program. On June 13th, police officers associated with defendant's murder case returned JA to the drug court on the warrant for absconding.[1] JA, who testified that he began cooperating with the police in June 2005, was not remanded after that violation. Nor was he remanded after he tested positive for drugs on June 16th, or after two additional violations (August 24th and September 2nd) – one of which was a second relapse. As JA admitted, despite his violations of the treatment program conditions, the prosecutors did not ask for bail. When questioned whether he thought this favorable outcome was related to his discussions with the police on defendant's case, JA rejected that suggestion.

---

[1] In response to defense counsel's request for Rosario material immediately following JA's testimony, the ADA advised that she had been "present for all [of the police] interviews" with JA. This fact was not elicited before the jury by the prosecutor, likely in order to avoid any claim of improper bolstering of a prior consistent statement by the witness.

Defense counsel also elicited from JA that he was an admitted "career criminal" and, as JA further agreed, if counsel were to go through the facts of all of his prior convictions, "we'd be here until probably Sunday morning." Counsel then cross-examined JA as to his extensive criminal record, impeaching the witness when he attempted to mitigate the serious nature of the underlying facts of certain convictions.

On redirect, JA clarified that, after he absconded on June 9th, he contacted his drug counselor who (along with the police) walked him over to court, where his counselor and "the DA" spoke with the judge. Although the trial prosecutor clarified that the judge presiding in the witness's drug court was not the judge presiding in defendant's murder case, she failed to identify herself as "the DA" who appeared in court with JA on the return on the warrant. The witness also stated that he believed his drug counselor "got [him] another shot."

During the charge conference, defense counsel requested a jury instruction that JA received consideration for his testimony as a matter of law. Counsel asserted that the witness violated the terms of his initial guilty plea on five different occasions, including leaving the drug program three times, and that the People's failure to request bail in JA's burglary case despite his criminal history and relapses was proof that "something [was] happening here to protect [JA]." The court denied the request, but agreed to give a general credibility charge that permitted the jury to consider a witness's motive for testifying, including any possible benefit or advantage the witness may have received.

Thereafter, during his summation, defense counsel attacked JA's credibility on multiple grounds. Defense counsel pointed out the misleading nature of JA's direct testimony regarding the imposition of his sentence on the burglary case. He further asserted that JA only contacted the police to provide false information on defendant's high profile case because he had absconded from his drug treatment program in June 2005 and emphasized that the officers in defendant's murder case accompanied JA to court on the return on the bench warrant. Counsel also maintained that JA, who was still "facing 3 and a half to 7 years," was not a sentenced prisoner testifying "out of the goodness of his heart." Finally, he argued that JA's testimony was an act of desperation by the People and it "completely destroyed" their case.

Defendant was convicted of murder in the second degree on the theory of felony murder, robbery in the first degree and criminal possession of a weapon in the second degree. The count of intentional murder was not submitted to defendant's jury. The conviction was affirmed on direct appeal (58 AD3d 750 [2d Dept 2009]).[2]

In March 2015, defendant brought this CPL 440.10 motion to vacate his conviction, alleging multiple claims of prosecutorial misconduct. Using JA as his primary source of sworn allegations, defendant asserted that the People had violated their Brady obligation by failing to turn over evidence that there was an agreement to confer a benefit on JA in

_____

[2] Defendant's trial lasted nearly two weeks and the jury took less than four hours to deliver its guilty verdict. In addition, when affirming the judgment of conviction, the Appellate Division characterized the evidence against defendant as "overwhelming" (58 AD3d at 751).

exchange for his testimony at defendant's murder trial. In addition, defendant asserted that the trial prosecutor personally intervened in JA's burglary case by procuring his release without bail during the June 13th drug court appearance, failed to correct JA's trial testimony to specify that she was the "DA" who participated on June 13th, and failed to correct his characterization of his performance as "good" in the drug treatment program.[3] The People, who acknowledged the trial prosecutor's appearance at the June 13th proceeding in their motion papers, opposed the motion to vacate the judgment, but consented to a hearing on any disputed facts.

The transcript of JA's June 13th court proceeding was in evidence at the hearing. It reflects that JA was represented by his attorney on the burglary case and that defendant's trial prosecutor appeared for the People. The prosecutor told the court that it was a voluntary return on a warrant and asked if "we" may approach the bench, "[w]hereupon, a discussion was held off the record." At the hearing, the prosecutor testified that she accompanied JA to that court appearance because she could not let him leave her office on his own because there was an open warrant. She denied considering him a witness in defendant's case at that early juncture because she had yet to investigate his statement. The ADA explained that she asked to approach the bench for purposes of JA's safety because she did not want to announce in open court that JA came to speak with her about a

---

[3] Defendant also asserted an additional Brady argument – that the People failed to disclose JA's EAC-Link records concerning his prior psychiatric history – as well as Rosario and newly discovered evidence claims. EAC-Link is a nonprofit organization comprised of social workers who provide case management for criminal defendants who are participating in drug or mental health diversion programs.

homicide. She maintained that she told the judge that JA was giving purported information about a murder case and did not take any position about his bail/remand status in the burglary case. She explained that her preference would be for an individual in JA's position to be remanded because it is easier to locate a witness if he is in custody.

The evidence at the hearing also included a June 15, 2005 email from a high-ranking executive ADA in the District Attorney's Office to the director of EAC-Link indicating that the District Attorney's Office – the same agency prosecuting both JA's burglary case and defendant's murder case – was interested in JA's progress in the drug treatment program. In addition, defendant's witnesses established that drug addicts participating in drug treatment court often fall into relapse and that it is very common for such individuals to be given multiple opportunities by the court to stay in the program rather than be remanded to prison. The ADA in charge of the Mental Health Court Bureau testified that the prosecutor, as an advocate, will often take a position as to whether a defendant is succeeding or failing in the program but, once a defendant has taken a conditional plea, "his fate really lies in the hands of the judge."

The hearing evidence further revealed that, on September 19, 2005, three days prior to JA's testimony at defendant's trial, he was discharged from a treatment facility for bringing cigarettes into the facility and distributing them to other patients. At his court appearance on that date, JA explained "I have a hard time with the cigarettes. I'm a big smoker. I'm supposed to be testifying . . . this week in a murder case, so I was smoking a lot." JA was not remanded, and was given another opportunity to participate in an

outpatient treatment program. Neither this specific violation nor the transcript of the September 19th proceeding was disclosed to defense counsel at trial. Notably, defendant's trial counsel testified at the hearing that he was unsure whether he would have used that information, observing that "most people would consider bringing cigarettes to a facility to be something that's not so sinister."

The October 2006 transcript of JA's sentencing proceeding on the burglary conviction was also admitted into evidence. Based on JA's ultimate failure to successfully complete his 18- to 24-month drug treatment program, he was sentenced to 3½-7 years in prison, the maximum term he originally faced. At that proceeding, approximately one year after defendant's conviction, where JA was represented by the same attorney who represented him at his June 13th drug court appearance, no reference was made to JA's cooperation at defendant's murder trial.

In all, defendant presented five witnesses at the hearing – JA, the lead prosecutor at defendant's trial, the ADA in charge of the Mental Health Court Bureau, defendant's trial counsel and one of the detectives who worked on defendant's case. The only witness who testified to any type of arrangement or tacit agreement by which JA would receive a benefit for his testimony at defendant's trial was JA himself, who was soundly discredited. Indeed, Supreme Court found his testimony to be "absolutely incredible," remarking that "it was so patently incredible it bordered on being laughable and embarrassing."[4] Given JA's

---

[4] On cross-examination, JA admitted that he did not recant his trial testimony until more than seven years after trial, after he was approached by an individual connected to defendant. In his initial recorded conversations with a defense investigator, JA maintained

prior, and recorded, contrary statements to an investigator for the defense as well as his internally inconsistent hearing testimony, defendant's 440 counsel stated that, "if the court is so inclined, by all means, dismiss [JA's] hearing testimony outright and throw it in the garbage," as his testimony was unnecessary to sustain defendant's burden of proof. Supreme Court specifically credited the testimony of the remaining witnesses, including the People's sole witness – another Giuca case detective.

At the conclusion of the hearing, Supreme Court denied defendant's CPL 440.10 motion, finding no evidence of any understanding or agreement between the prosecution and the witness. The court held that, even assuming JA received a benefit by being released instead of remanded by the court based on his drug treatment violations, the error was not material. For the same reason, the court held that there was no reasonable possibility that the failure to clarify that defendant's trial prosecutor was the ADA who appeared with the witness in drug court affected the jury's verdict.

The Appellate Division reversed and granted defendant's motion to vacate his conviction, but did so while deferring to Supreme Court's credibility determinations (158 AD3d 642 [2d Dept 2018]). The Court held that the People had a duty to disclose certain Brady information – specifically, the circumstances of JA's initial contact with the police relating to defendant's case, the trial prosecutor's June 13th appearance, and the information she provided to the drug treatment court at that appearance. The Court also

_____

that his trial testimony was truthful. However, he eventually signed a written recantation containing statements that, by JA's own admission, were false.

held that the trial prosecutor was required to correct JA's trial testimony about his "good" progress in drug treatment and the extent of his contact with her and the police detectives. Although the Court found no evidence of any express promise of a benefit to JA, it nonetheless concluded that, had the evidence at issue been disclosed, the jury could have found that "'there was . . . a tacit understanding' between [JA] and the prosecution that he would receive or hoped to receive a benefit for his testimony" (158 AD3d at 646, quoting People v Cwikla, 46 NY2d 434, 441 [1979]).

A Judge of this Court granted the People leave to appeal (31 NY3d 1117 [2018]) and we now reverse.

The People have an obligation under Brady to disclose evidence and information in their possession that is both material and favorable to the defense (see People v Vilardi, 76 NY2d 67, 73 [1990]). "'The Brady rule is based on the requirement of due process,' and '[i]ts purpose is not to displace the adversary system as the primary means by which truth is uncovered,' but to ensure that the accused receives a fair trial" (People v Garrett, 23 NY3d 878, 884 [2014], quoting United States v Bagley, 473 US 667, 675 [1985]). The prosecutor's duty to disclose "arises out of considerations of elemental fairness to the defendant and as a matter of professional responsibility. Negligent, as well as deliberate, nondisclosure may deny due process. Good faith, therefore, may not excuse even a negligent failure to disclose unrequested exculpatory evidence where that evidence is highly material to the defense" (People v Simmons, 36 NY2d 126, 131-132 [1975] [citations omitted]). Impeachment material that may affect the credibility of a principal

prosecution witness, including "promises of leniency given to the witness in exchange for favorable testimony against an accused," must be disclosed (People v Steadman, 82 NY2d 1, 7 [1993]).  The People's duty also "extends to correcting mistakes or falsehoods by a witness whose testimony on the subject is inaccurate" (82 NY2d at 7).  "Where a prosecutor elicits or fails to correct such inaccurate testimony, reversal and a new trial are necessary unless there is no 'reasonable possibility' that the error contributed to the conviction" (People v Colon, 13 NY3d 343, 349 [2009] [citation omitted]).

"To make out a successful Brady claim, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (Garrett, 23 NY3d at 885 [internal quotation marks and citations omitted]).  In New York, where a defendant made a specific discovery request for a document, and the information was not disclosed, we measure the third prong of the materiality of the suppressed Brady material by considering whether there is a reasonable possibility that disclosure of the evidence would have changed the result of the proceedings (Vilardi 76 NY2d at 77).  In the absence of a specific request by defendant, materiality is established if there is a "reasonable probability" that the result would have been different if the evidence had been disclosed – meaning " 'a probability sufficient to undermine the court's confidence in the outcome of the trial' " (People v Hunter, 11 NY3d 1, 5 [2008], quoting People v Bryce, 88 NY2d 124, 128 [1996]; see Kyles v Whitley, 514 US 419, 434 [1995]).

Defendant asserts this Brady violation in the procedural context of a postconviction CPL article 440 motion. "At the hearing of a motion to vacate the conviction, the 'defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion'" (People v Thibodeau, 31 NY3d 1155, 1158 [2018], quoting CPL 440.30 [6]). Supreme Court properly rejected defendant's claim. Defendant's own witnesses at the CPL 440.10 hearing proved there was no agreement with JA – tacit or otherwise. Their testimony was that JA never asked for anything and that he was not promised anything in return for his testimony. Nor does the evidence reveal any indication that JA ever expressed any hope or expectation that his cooperation would result in some favorable treatment. The testimony was that, when asked, JA specifically denied wanting any benefit for his testimony. There is no dispute that JA did not speak with law enforcement about defendant's case until after he had already brokered his agreement on his burglary case, pleaded guilty, and obtained a promise of a conditional sentence that left the possibility of a complete dismissal of his burglary conviction within his own control. The dismissal required one thing – that he successfully complete his 18- to 24-month drug treatment program.

The Appellate Division erred in its determination that the jury could have found a tacit understanding that the witness "would receive or hoped to receive a benefit for his testimony" (158 AD3d at 646). That holding seems to have been based, in part, on an overly broad reading of some of our cases addressing tacit agreements (see e.g. People v Novoa, 70 NY2d 490 [1987]; People v Cwikla, 46 NY2d 434 [1979]). In Cwikla, the

People suppressed a letter to the parole board on behalf of the testifying accomplice wherein the prosecutor conveyed the accomplice's "extreme cooperation" at the defendant's first trial; a specific defense request was made for that material at the retrial. We stated that the suppression of the material was a Brady violation, as "the jury could have found that, despite the witness's protestations to the contrary, there was indeed a tacit understanding between the witness and the prosecution, *or at least so the witness hoped*" (46 NY2d at 441 [emphasis added]).  Our holding was specifically predicated on the correspondence between the office of the District Attorney and the Parole Board against the backdrop of the circumstances of the testifying witness's own criminal case.  A witness's wholly subjective hope of favorable treatment, in the absence of any objective circumstances that reasonably substantiate the witness's expectation, cannot unilaterally form the basis of a tacit understanding – particularly where, as here, the only credible evidence in the record is that the witness was given no promises or assurances by, and communicated that he did not request or expect any favorable treatment from, the People.[5] Rather, as we have held, the prosecutor's duty to disclose the existence of an agreement "arises from the fact that the prosecutor and the witness have reached an understanding in

_____

[5] Federal courts have been more explicit in holding that the prosecution does not have to disclose evidence of an agreement that does not exist, even if the witness may have hoped to obtain some consideration or favorable treatment as a result of his or her testimony (see White v Steele, 853 F3d 486, 491 [8th Cir 2017] ["without a hint or deal, even if (the witness) did expect to get something, the State could not have known of (the witness's) expectation.  Accordingly, the State did not violate Brady . . . by failing to disclose an agreement that did not exist"]; Collier v Davis, 301 F3d 843, 849 [7th Cir 2002] [the witness's "general and hopeful expectation of leniency is not enough to create an agreement or an understanding"]; Shabazz v Artuz, 336 F3d 154, 163 [2d Cir 2003]).

which the witness's cooperation has been exchanged for some *quid pro quo* on the part of the prosecutor" (Novoa, 70 NY2d at 497). That type of understanding, or the making of any assurances in this regard creating an expectation of some benefit, was plainly absent in this case.

We do recognize, however, that even where there is neither an express nor a tacit agreement, the People have a broader responsibility to disclose favorable information tending to show that a witness had an incentive to testify falsely in order to curry favor with the prosecution on an open criminal case (see Colon, 13 NY3d at 350 n 4). Whether this information must be turned over is not dependent on whether the prosecutor believes it to be credible (see People v Baxley, 84 NY2d 208, 213-214 [1994]). Nor is the nondisclosure of material evidence excused by the good faith belief of the prosecutor that the material was not relevant (see Brady, 373 US at 87).

Given the circumstances of the conditional sentence promise in the pending burglary case and JA's violations of his treatment program, it could be argued that JA may have perceived that his upcoming testimony at the murder trial was beneficial to his retention in the drug treatment program as he was repeatedly released by the court, without the People's objection, on his own recognizance despite those violations.[6] There was undisclosed evidence that would have enabled defense counsel to deepen his argument that JA was

---

[6] Relapse is a common occurrence and the legislature has recognized judicial flexibility is necessary in making determinations regarding violations of conditions for participants in drug diversion programs (see People v Fiammegta, 14 NY3d 90 [2010]; CPL 216.05).

testifying falsely in order to receive favorable treatment from the court with the People's acquiescence. Specifically, defendant argues the People should have disclosed: emails from the executive ADA in charge of the drug treatment program to the director of the EAC indicating the People's interest in what was happening with JA in the drug treatment program, JA's release after the September 19th cigarette violation, and the trial prosecutor's appearance at the June 13th proceeding.

"We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict'" (Giglio v United States, 405 US 150, 154 [1972], quoting United States v Keogh, 391 F2d 138, 148 [2d Cir 1968]).[7] Assuming the People had an obligation to disclose this information, there is no reasonable possibility that it would have resulted in a different verdict. In Turner v United States, the United States Supreme Court observed that, determining the materiality of these types of Brady claims is "legally simple but factually complex. We must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the record' and determine in light of that examination" whether there is a reasonable possibility that the result of the trial would have been different if the evidence had been disclosed (__ US __, 137 S Ct 1885, 1893 [2017] [citations omitted]). The Court did "not suggest that impeachment evidence is immaterial

_____

[7] We note that any confusion in determining what information the People must turn over may be attributed to the failure of the police and prosecutor to document the basic facts and circumstances of the witness's cooperation. As defense counsel argued at trial, the absence of a "single solitary note" recording these "critical interviews" in a murder investigation would appear to be anomalous.

with respect to a witness who has already been impeached with other evidence," but held that neither "the undisclosed impeachment evidence . . . [which] was largely cumulative of impeachment evidence petitioners already had and used at trial," nor "the cumulative effect of the withheld evidence" would have impacted the jury verdict (137 S Ct at 1894-1895).

In determining that a Brady violation occurred, the Appellate Division failed to do the required materiality analysis as to the suppressed information. At the trial, defendant's counsel accessed JA's court file on his open burglary case, as well as JA's extensive criminal history. In his cross-examination of the witness, defense counsel emphasized JA's status as a "career criminal" and highlighted the differences between the witness's factual descriptions of his crimes and the official records of those convictions. Most importantly, counsel elicited facts enabling him to argue to the jury that JA, despite having heard defendant's jailhouse admissions months before, contacted the police working defendant's case after he absconded from the drug program on June 9th, that defendant's case detective and a "DA" appeared with JA in drug court on June 13th for return on the warrant issued when JA absconded, and that JA, having violated the conditions of the program, was nonetheless released by the court following that appearance. Counsel made the jury aware that JA continued to be released despite additional violations of his drug treatment program conditions and that bail was never requested in his burglary case notwithstanding those violations. There is no dispute that defense counsel at trial knew that the prosecutor's office for JA's pending burglary case and defendant's murder case was the same entity (see

Giglio, 405 US at 154) and, accordingly, knowledge of the absence of a bail or remand request was chargeable to the trial prosecutor (see Steadman, 82 NY2d at 8).

Given his knowledge of the court history of JA's burglary case and the extensive impeachment material elicited at trial, defense counsel was able to argue forcefully that JA was testifying falsely to curry favor from the court and the prosecutor in connection with his pending case. Contrary to the dissent's position, the undisclosed impeachment evidence at issue here, like that in Turner, was more of the same evidence that was available to the defense and used to impeach the witness at trial. The disclosed evidence provided ample basis for defense counsel to argue to the jury that JA had a bias in favor of the People, as he hoped to receive a benefit in exchange for his testimony, and that the People's failure to request bail in his open burglary case despite his drug program violations was the benefit conferred. Nor can it be ignored that, as noted, the People presented strong evidence of defendant's guilt at trial – including defendant's self-incriminating statements to his friends, his efforts to dispose of the gun shortly after the murder and the physical evidence from his house (the blanket) recovered from the crime scene. In sum, given the above, there is no reasonable possibility that the failure to disclose the particular evidence would have affected the verdict.

Relatedly, the trial prosecutor failed to correct JA's mischaracterization of his progress in drug treatment and failed to disclose her involvement at his June 13th appearance in drug court. The trial record reveals defense counsel knew of at least five violations and, in fact, did impeach JA as to his purported "good" progress. On the other

hand, while the identity of the particular prosecutor does not change the fact that the District Attorney's Office is viewed as one entity for Brady disclosures, the ADA should have "clarif[ied] the record by disclosing all the details of what had actually transpired" (Steadman, 82 NY2d at 8) at the June 13th appearance.  Nonetheless, as the 440 record demonstrates, there was no deal between the People and the witness and the witness was not offered any promises or assurances in reference to his burglary case.  Again, to say that there was ample impeachment evidence at trial against the witness on multiple levels is an understatement.  In light of the above, there is no reasonable possibility that the knowledge that the trial prosecutor was the specific ADA who stood up for the People at the June 13th appearance and that JA was still in a drug program despite additional program violations – leaving treatment and bringing cigarettes into a facility – would have changed the jury's verdict.

Defendant's remaining Brady argument – that the People suppressed JA's EAC-Link records – is without merit (see Garrett, 23 NY3d at 886-888), as are his Rosario and newly discovered evidence claims.

Accordingly, the order of the Appellate Division should be reversed and the order of Supreme Court reinstated.

People v John Giuca

No. 38

RIVERA, J. (dissenting):

I would affirm the Appellate Division order which granted defendant John Giuca's

CPL 440.10 motion and ordered a new trial based on the People's violation of defendant's

rights under <u>Brady v Maryland</u> (373 US 83 [1963]) and <u>Giglio v United States</u> (405 US

- 1 -

150 [1972]). Specifically, the People improperly failed to provide defendant with impeachment material regarding a jailhouse informant's motivation to fabricate defendant's alleged inculpatory statements and failed to correct misrepresentations during the informant's testimony (People v Steadman, 82 NY2d 1, 7 [1993]). As the majority acknowledges, the prosecutor withheld information about the relationship between this key witness and the District Attorney's Office and also failed to correct the informant's inaccurate and misleading statements, including one brought out by the prosecutor on redirect (majority op at 18).

The Appellate Division accurately and comprehensively describes the relevant trial testimony, CPL 440.10 hearing evidence, and the People's suppressed information that establish the Brady/Giglio/Steadman violations and I summarize here only those events of particular significance to my analysis. After the People's jailhouse informant witness (JA) absconded from his drug program on June 9, 2005, he contacted police and then went to the District Attorney's Office on June 13th where he was questioned by the prosecutor on defendant's case. JA informed her that he had an open warrant for leaving his program. The detectives on the case and the prosecutor then walked JA to drug court, where she appeared on the record in place of the Assistant District Attorney handling JA's case. It was the prosecutor who requested a sidebar with the judge—not JA's counsel or someone else, as implied during JA's trial testimony. At the sidebar, the prosecutor informed the court that JA was providing information in a murder investigation. The prosecutor also received and reviewed a copy of the prosecution file in defendant's drug case. Shortly

thereafter, the District Attorney's Office contacted the agency overseeing JA's drug treatment and requested that his case be flagged for "special attention" and the District Attorney's Office be updated on his progress.

At defendant's trial, defense counsel was able to cross-examine JA on the fact that he was in a drug treatment program as part of a guilty plea on his burglary case, that he had violated the program's terms several times without being remanded, that he had a lengthy criminal history, and that he was escorted to court by police officers when he returned on the warrant. However, the questioning was limited because counsel could not ask—because he did not know—about the prosecutor's sidebar or about the various requests and notes from her office archiving its ongoing communications with JA's drug program officials. Defense counsel's summation was similarly hampered by not having complete information about the People's involvement in JA's criminal case. Counsel argued to the jury that JA's testimony showed that the prosecutor presented an entirely different theory once the credibility of the People's other witnesses (defendant's friends) was challenged. To undermine JA's credibility, counsel stressed JA's criminal history—information previously brought out by the prosecutor on her direct examination. He remarked rhetorically, "isn't it funny" that the police in this case were present with JA in court when he appeared after a warrant was issued for him, suggesting that JA was not testifying against defendant simply for altruistic reasons. Significantly, the jury did not hear about the extent of the People's actions that may well have provided the basis for an inference of

a tacit agreement or JA's expectation of beneficial treatment in his criminal case in exchange for his testimony against defendant.

The prosecutor, for her part, was able to take full advantage of JA's testimony during her summation to undermine counsel's argument that the witnesses presented an incoherent version of defendant's actions and the events leading to the murder. To set the stage for her counter-narrative, the prosecutor argued that JA's testimony tied all the evidence together and was key to understanding the testimony of the People's other witnesses. According to the prosecutor, defendant gave partial statements to his friends— explaining some of the testimonial inconsistencies—but did not hold back in talking to JA because he was "similarly situated" and was his "prison buddy." Taking this version to its logical conclusion, the prosecutor suggested defendant's statement to JA established that defendant had a much larger role in the murder than what he disclosed to his friends. Apart from using JA's testimony as the fulcrum to explain the prosecution's theory of disparate storytelling by defendant and his friends, the prosecutor worked mightily to paint JA in a positive light. She conceded that he had a criminal history and drug problems, but urged the jury to see him as a flawed individual who was telling the truth about what defendant told him. To undermine counsel's argument that JA had a motive to fabricate his testimony, the prosecutor went further and offered her own opinion that JA was "very honest about his problems and his criminal past." She stressed that there was no evidence that JA received anything for his testimony, that it was not surprising he was given multiple chances in his drug program because he acted responsibly by contacting his caseworker

after absconding, and that he had contacted police to help with defendant's case because "for once he tried to do something right."

At the hearing on defendant's CPL 440.10 motion, the evidence established that, contrary to the picture painted by the prosecutor at trial, there was, at a minimum, inferential evidence that JA actually benefitted and might reasonably expect continued benefits in his drug case in exchange for his testimony against defendant. The prosecutor admitted she was the "DA" who walked JA to his June appearance and requested a sidebar where she informed the judge that JA was a witness in a murder trial. Emails confirmed the numerous contacts between the District Attorney's Office and EAC, tracking JA's progress at the request of a supervising Assistant District Attorney within the office. "Prosecutors occupy a dual role as advocates and as public officers and, as such, they are charged with the duty not only to seek convictions but also to see that justice is done.  In their role as public officers, they must deal fairly with the accused and be candid with the courts" (Steadman, 82 NY2d at 7 [internal citations omitted]). In furtherance of that duty, the prosecutor has a legal obligation under the federal constitution to turn over favorable information to a defendant (see Giglio, 405 US at 154-155; Brady, 373 US at 86; Steadman, 82 NY2d at 7). Where, as here, a defendant makes a specific request for undisclosed evidence, such evidence is not material under Brady if there is no reasonable possibility that it would have changed the result of the proceeding (see People v Fuentes, 12 NY3d 259, 263 [2009]). "[T]he existence of an agreement between the prosecution and a witness, made to induce the testimony of a witness, is evidence which must be disclosed under

Brady principles" (People v Cwikla, 46 NY2d 434, 441 [1979]). In Cwikla, relying on

Brady and Giglio, this Court held that the evidence relating to the witness should have been

disclosed because it was "of such a nature that the jury could have found that, despite the

witness' protestations to the contrary, there was indeed a tacit understanding between the

witness and the prosecution, or at least the witness so hoped" (id. at 441 [emphasis added]).

Similarly, "[w]here a prosecutor elicits or fails to correct [knowingly false or mistaken

material testimony of a prosecution witness], reversal and a new trial are necessary unless

there is no reasonable possibility that the error contributed to the conviction" (People v

Colon, 13 NY3d 343, 349 [2009] [internal quotation omitted]).

Defendant's trial counsel made a specific request and there is no dispute that the

prosecutor suppressed information about her involvement and her office's communications

with JA's drug program administrators that could have been used to impeach JA and

suggest JA was motivated to fabricate testimony to gain a benefit. Nor is there

disagreement that the prosecutor bore a legal responsibility to correct JA's inaccurate and

misleading statements. The only question on this appeal is whether there is a reasonable

possibility that proper disclosure and corrective action would have made a difference in the

outcome of defendant's trial. I conclude it would.[1]

---

[1] Since I conclude that the People violated defendant's right to a fair trial by suppressing
Brady material regarding JA's motive to fabricate, and the People disclosed the suppressed
materials prior to the 440.10 hearing, I do not address defendant's remaining contention
that he was entitled to JA's drug treatment and psychiatric records from the agency
overseeing his drug rehabilitative services.

The suppressed information would have provided defense counsel with critical information to dispute the prosecutor's claim that JA was simply "doing the right thing" by testifying and that the court in JA's burglary case acted unaware of the People's interests in securing JA's testimony against defendant. Without the suppressed evidence, counsel was left to attack JA's credibility in general terms, exploring standard impeachment areas typical for a jailhouse informant, namely criminal history and a generic interest in gaining a benefit in exchange for information about a fellow inmate. What counsel could not argue is that the prosecutor was the one who requested a sidebar at the June 13th court appearance in JA's drug case—information that supported a foundation for an inference that such action influenced the judge's decision not to remand JA—even though JA had several relapses, absconded and was returned on a warrant, and had been warned several times that he faced incarceration for such violations. Defense counsel was unable to argue that the jury could infer that JA received a benefit in court on June 13th, the first of several, afforded every time he relapsed and avoided jail. Counsel could not urge the jury to reject that this treatment was more than mere coincidence or the beneficence of the court repeatedly giving a substance abuser another chance, as the prosecutor argued in summation. Counsel did not have available the notes from the District Attorney's Office to suggest that the Office had an unusual heightened interest in JA's progress and that the officials at the drug program and the court understood that JA was an important witness in a homicide case, a highly publicized case with pressure on the District Attorney's Office to secure a guilty verdict. Conversely, the prosecutor was free to argue that JA received nothing and expected nothing

in return for his testimony, even though the undisclosed information would suggest otherwise.

In violation of her duty as a public officer to "deal fairly with the accused and be candid with the courts" (Steadman, 82 NY2d at 7), the prosecutor also misled the court, the jury, and defense counsel by failing to correct JA's statements that he was doing well in his program, or disclose that she was "the DA" who appeared at the sidebar with the court and that it was she who told the judge in JA's drug case that he was providing information in a murder investigation. The latter is particularly troubling conduct as the prosecutor drew out the misleading statement on her redirect of JA to offset any possible damage to his credibility inflicted by counsel's cross-examination. This was not a mistake or misstep because the prosecutor was quick to have JA clarify that "the judge" in his drug case was not the same judge present during defendant's trial, while she avoided eliciting that she was "the DA" at the June 13th appearance. This was an attempt to recover ground by bolstering the credibility of the witness after defense counsel's cross examination—a particularly egregious violation of our law and the prosecutor's ethical obligations (22 NYCRR 1200.30 Rule 3.8[b]).

Although the majority concedes that "[t]here was undisclosed evidence that would have enabled defense counsel to deepen his argument that JA was testifying falsely in order to receive favorable treatment from the court with the People's acquiescence" (majority op at 15-16), the majority concludes that this would merely have been cumulative to the

impeachment evidence used by counsel at trial. I disagree with this characterization of the suppressed information and its potential use by defense counsel.

The information was not merely cumulative evidence of what counsel already had available—meaning "more of the same" or "tending to prove the same point" (see Black's Law Dictionary [10th ed 2014]). The information the prosecutor failed to turn over concerned actions by the trial prosecutor and representatives of the District Attorney's Office—far different evidence than what counsel used on JA's cross examination and during summation, which focused on JA and the police, namely the informant's criminal history (which the prosecutor relied upon to suggest JA was trying to overcome his past), and his police escort to the court on June 13th. True enough that both types of information put in question JA's credibility, but only as a general matter, and as related to the actions of the police. In contrast, the suppressed information provides a distinct basis for an inference that JA fabricated defendant's alleged inculpatory statements based on benefits associated and derived from the prosecution. Labeling this information as additional but unnecessary for counsel's argument, as the majority does here, also underestimates the potential use of this information in the hands of a skilled defense lawyer (see Davis v Alaska, 415 US 308, 316 [1974] ["Cross-examination is the principal means by which the believability of a witness and the truth of [the witness's] testimony are tested"]; People v Walker, 83 NY2d 455, 461 [1994] ["[I]mpeachment is a particular form of cross-examination whose purpose is, in part, to discredit the witness and to persuade the fact finder that the witness is not being truthful"]).

The majority's view of what constitutes cumulative evidence is overly broad and unsound, as made apparent by simple illustrations of truly redundant information. For example, if the prosecutor had suppressed information that JA had an additional criminal conviction when it was already revealed to the jury that he had an extensive criminal history, this would be cumulative impeachment evidence as it would not have significantly aided the jury's assessment of JA's credibility. Therefore, failure to disclose this additional crime would not warrant reversal of defendant's conviction under <u>Brady</u>. Similarly, the suppressed information about JA's program violation, which I do not include as part of the prosecutor's <u>Brady</u> violation, is cumulative since two other program violations were known to defense counsel. Again, more of the same; not likely to surprise the jury or affect the verdict. These examples are in stark contrast to the undisclosed information of the prosecutor's personal involvement in JA's burglary case, her representations to the court and her office's ongoing interest in JA for the sole reason that he was a valuable People's witness. This undisclosed impeachment evidence was qualitatively different – not merely reflecting on JA's overall credibility but providing a specific, concrete reason for JA to lie in the hopes of receiving ongoing favorable attention from the District Attorney's Office.

Nor does the majority's reliance on <u>Turner v United States</u>, (__ US __, 137 S Ct 1885, 1893 [2017]), support a conclusion that the undisclosed information about the actions of the individual prosecutor and the District Attorney's Office was cumulative or would have had a cumulative effect given the trial evidence (majority op at 16-17). <u>Turner</u> involved an assault and murder committed by a large group of individuals acting in concert.

The petitioners alleged that they were denied information about the trial witnesses that would have permitted them to mount a defense that the murder was committed by one or two individuals, rather than, as the Government maintained, petitioners as a group. The withheld information in Turner in no way resembles what the prosecutor suppressed here, as a summary of the petitioners' alleged Brady material reveals. At the trial the record evidence showed that one witness was on PCP when she observed the events and so "it would not have surprised the jury to learn that [the witness] used PCP on yet another occasion"; another witness had been impeached "about changes in her testimony over time, leaving little added significance to the [undisclosed] note that she changed her mind" about agreeing with another witness's claims; and a third witness had effectively been impeached "with her shifting stories about what she witnessed [so] [k]now[ledge] that a detective raised his voice during an interview with her would have added little more" (id. at 1894-1895). Unlike the evidence suppressed in defendant's case, the undisclosed impeachment information in Turner was of questionable value to the defense because it was more of the same type of conduct by the same witness.

Here, the mere fact that counsel impeached JA to some extent cannot support excusing the People from their constitutional obligations. The majority quotes but misapprehends Turner's warning about reading too much into its fact-specific conclusion, which states in full: "[w]e of course do not suggest that impeachment evidence is immaterial with respect to a witness who has already been impeached with other evidence. We conclude only that in the context of this trial, with respect to these witnesses, the

cumulative effect of the withheld evidence is insufficient to undermine confidence in the jury's verdict" (id. at 1895 [citations omitted]). The same cannot be said here where the suppressed information described actions by the prosecutor, actions which a jury may have considered more likely to motivate JA to fabricate statements favorable to the People's case against defendant.

The applicable standard, that there was no reasonable possibility that the result of the proceeding would have been different if the undisclosed material had been turned over, is an extremely low bar. It is lower than "reasonable probability," which "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal" (Kyles v Whitley, 514 US 419, 434 [1995]). Even under the higher reasonable probability standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence" (id.; see also Matter of Beautisha B., 115 AD3d 854, 854 [2d Dept 2014] ["To establish a fact by a preponderance of the evidence means that the fact is more likely than not to have occurred"], citing Matter of Tammie Z., 66 NY2d 1 [1985]). The relevant question then is whether a reasonable possibility exists that the suppressed evidence may have affected the outcome of defendant's case. On this record, I cannot say that not even one juror would have thought JA held out hope—corroborated by the conduct of the prosecutor and her Office—for favorable treatment by the courts or otherwise sought to curry the prosecutor's favor in

JA's drug case. At least one juror could conclude that it was not simply the court, as usual, giving multiple chances to a person in rehabilitation—as suggested by the prosecutor in her summation and by the majority here (majority op at 8, 15, n 6)—but rather, special treatment for JA as the People's witness. Of course, just one juror would have been enough to change the outcome of defendant's trial (see Turner, 137 S Ct at 1897 [Kagan, J., dissenting] [suppressed evidence "could well have flipped one or more jurors—which is all Brady requires"]).

Finally, as all the Justices in Turner agreed, expansive disclosure should be the norm and the "better course is to take care to disclose any evidence favorable to the defendant" (Turner, 137 S Ct at 1893). Even the dissent joined in this part of the majority opinion, agreeing that "such evidence ought to be disclosed to defendants as a matter of course" (id. at 1897 [Kagan, J., dissenting]). Indeed, a generous policy of disclosure of Brady material fully aligns with our recognized interests in finding the truth and rejecting efforts at gaming the criminal justice system that undermine the truth-finding process (Strickler v Greene, 527 US 263, 280-281 [1999] [The Brady line of cases "illustrate the special role played by the American prosecutor in the search for truth in criminal trials"]). "The Brady rule's 'overriding concern [is] with the justice of the finding of guilt', and the Government's 'interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done'" (Turner, 137 S Ct at 1893 [internal citations omitted]). All this reflects the principled view that "[c]onstitutional requirements aside, turning over exculpatory materials is a core responsibility of all prosecutors" (id. at 1897 [Kagan, J., dissenting]).

"Put another way, 'When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful'" (People v Andre W., 44 NY2d 179, 185 [1978] quoting Griffin v United States, 183 F2d 990, 993 [DC Cir 1950]). The District Attorney's Office here asserts that it is the policy of its office to "generally disclose all information that is identified as even arguably favorable to the defense, regardless of the prosecutor's assessment of the materiality of that information." This correct articulation of the prosecutor's duty comes too late for defendant.

Since there is a reasonable possibility that counsel's use of the suppressed information would have changed the result of the proceedings, defendant met his burden in support of his 440.10 motion for a new trial (Fuentes, 12 NY3d at 263; People v Vilardi, 76 NY2d 67, 77 [1990]). The majority's reversal of the Appellate Division order granting the same is erroneous on the law as applied to the record before us. I dissent.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order reversed and order of Supreme Court, Kings County, reinstated.  Opinion by Chief Judge DiFiore.  Judges Stein, Garcia, Wilson and Feinman concur.  Judge Rivera dissents and votes to affirm in an opinion.  Judge Fahey took no part.

Decided June 11, 2019