**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 19-3583

————————————

WILLIAM BASKERVILLE,
                                        Appellant

v.

UNITED STATES OF AMERICA

————————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3:13-cv-05881)
District Judge: Hon. Peter G. Sheridan

————————————

Before:   KRAUSE, PHIPPS, and FUENTES, *Circuit Judges*

(Filed: August 13, 2021)

————————————

OPINION[*]

————————————

FUENTES, *Circuit Judge*.

　　William Baskerville claims that the Government withheld evidence that another per-

son may have committed the murder underlying two of his conspiracy convictions. The

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

District Court found the suppressed evidence was not material, and therefore denied his motion to set aside or vacate his sentence. Because we agree with the District Court that Baskerville failed to demonstrate that disclosure of this evidence undermines confidence in the outcome of his trial, we affirm the District Court's decision.

## I.

The case against Baskerville arose out of an investigation into drug trafficking in Newark, New Jersey. Baskerville's cousin, Hakim Curry, ran a large drug operation selling cocaine and heroin. The organization had a tiered hierarchy, with Curry at the top, followed by one level of managers, who were above Baskerville. Baskerville, his two brothers, Rakeem and Hamid Baskerville, were the next level, overseeing other dealers, including Anthony Young, Jamal McNeil, and Jamal Baskerville, who in turn oversaw street-level dealers.[1]

In 2002, FBI Agent Shawn Manson recruited Deshawn "Kemo" McCray as a paid informant. Although first recruited to work on a different investigation, by the beginning of 2003, McCray's efforts led the FBI to members of Curry's organization. McCray made his first controlled purchase from Curry's organization in January 2003, buying crack cocaine from a dealer who eventually introduced McCray to Baskerville, at which point Baskerville began selling to McCray. McCray conducted a number of controlled purchases

---

[1] In the interest of clarity, all references to Baskerville are to Appellant William Baskerville, while we refer to other members of the Baskerville family by using their full names.

from Baskerville in 2003. The Government also tapped Curry's cell phone, giving them significant insight into his operations.

Based on McCray's information, the Government arrested Baskerville on November 25, 2003. After his arrest, Baskerville made numerous calls to a lawyer named Paul Bergrin, who had represented several members of Curry's organization. Bergrin represented Baskerville at his initial appearance. Baskerville immediately thought McCray was the source of the Government's information against him, and was overheard by a cellmate blaming McCray for his arrest. Curry also telephoned Bergrin the day of the arrest, and Bergrin told Curry that an informant named "K-Mo" was the source of the information against Baskerville. Due to the Government's wiretap, it was aware that Bergrin made this call. Young, who was in the same car as Curry during this call, determined that Bergrin was referring to "Kemo" McCray, but had mispronounced his name.

McCray was shot and killed on March 2, 2004 at the intersection of South Orange Avenue and 19th Street in Newark. He had been renovating a nearby house with his step-father, Johnnie Davis, and the two left to go to a local store at around 2:00 p.m., with McCray still wearing a dust mask from the construction. Davis testified that after the two men left the store, shots rang out and McCray fell to the ground dead, at which point Davis turned and saw an assailant hiding a gun and walking away. Young testified that he had been the assailant and that he had grabbed McCray by the shoulder, put a gun against his neck, and fired three or four shots into him. McCray fell to the ground while his assailant ran to a car that had pulled up during the altercation and drove off.

The Government then began an investigation into the murder of its informant. Agent Manson immediately suspected that Baskerville and other members of Curry's organization had conspired to murder McCray in retaliation for his cooperation, and the day after McCray was shot, she visited Baskerville in jail to tell him as much. Other detainees also overheard Baskerville blaming McCray for his arrest, and he told them that others were trying to kill the informant in his case.

The Government's investigation made little progress until Young called the FBI, claiming he had information about the murder. Despite initially claiming that another member of Curry's organization murdered McCray, Young eventually confessed to shooting McCray himself and agreed to cooperate. Young knew several details of the murder that only someone present would know: that McCray was lying face down when he left, that he was wearing a dust mask, and that he had been smoking a cigarette. He was able to corroborate what he knew by mentioning that Bergrin had mispronounced McCray's nickname as "K-Mo" in his call to Curry, which the Government already knew because of its tap on Curry's cell phone. Young also claimed that after Baskerville's arrest, he met Bergrin and other members of Curry's organization at Jamal Baskerville's house. Bergrin told those present that Baskerville was facing life in prison, but that he could win the case and get Baskerville released if they could eliminate McCray. Bergrin told the group as he left "no Kemo, no case."

Baskerville was subsequently indicted on eight drug trafficking offenses[2] and two conspiracy offenses relating to McCray's murder:  to murder a witness[3] and to retaliate against an informant.[4]  These two offenses are eligible for the death penalty, which the Government sought.  Young testified for the Government, confessing to the murder.  Baskerville's counsel's[5] trial strategy did not contest that Young killed McCray, but sought to cast Baskerville as unknowingly benefiting from the machinations of Curry's organization while he was behind bars awaiting trial.  Because the same jury that heard the trial evidence would decide whether to impose the death penalty, counsel was keen not to challenge the Government's characterization of Young as the murderer.  In addition to Young's confession and detailed knowledge of the shooting, having Young as the murderer was beneficial to Baskerville at the penalty phase:  with the admitted murderer having avoided a death sentence, counsel could argue that the less culpable Baskerville should not be punished more severely than the man who actually pulled the trigger.

Counsel's strategy failed at the guilt stage but prevailed on the penalty.  The jury convicted Baskerville on all counts, but did not sentence him to death.  Baskerville was

---

[2] These are not the subject of this appeal.

[3] In violation of 18 U.S.C. § 1512(k).

[4] In violation of 18 U.S.C. § 1513(e).

[5] Due to his role in the offense, Bergrin was disqualified as counsel for Baskerville.

sentenced to nine concurrent terms of life imprisonment. His conviction was affirmed on direct appeal.[6]

Bergrin was indicted approximately two years after Baskerville was sentenced. After numerous pretrial proceedings and a mistrial on two severed counts, Bergrin went to trial, representing himself. The Government's case against Bergrin mirrored its case against Baskerville, with Young again confessing to the murder at trial. Bergrin pursued a very different trial strategy, seeking to undermine Young's credibility. One piece of evidence Bergrin had that Baskerville did not was an FBI report of an interview with a jailhouse informant, Roderick Boyd. Agent Manson had interviewed Boyd on June 17, 2004, and memorialized the interview on a FBI form 302, which we thus refer to as the Boyd 302. Boyd was an inmate at the same facility as another member of Curry's organization, Malik Lattimore. While incarcerated, Boyd claimed that Lattimore openly discussed "killing a snitch on S. Orange and 19th Street, Newark."[7] Boyd claimed Lattimore had killed that "snitch," and that he was "still waiting on getting paid" by Curry for the killing.[8] Bergrin used the Boyd 302 in combination with other materials—including an identification of Lattimore as McCray's murderer that he obtained from Davis under false pretenses—to argue that Young was lying, motivated in part by a desire for leniency on a state law weapons offense. Bergrin's jury rejected this argument, convicting him on all counts.

---

[6] *United States v. Baskerville*, 448 F. App'x 243 (3d Cir. 2011).

[7] App. 797.

[8] App. 797.

Neither the Government nor Baskerville had mentioned the Boyd 302 at Baskerville's trial. Although Agent Manson testified that she had explored Lattimore as a possible suspect for McCray's murder, she did not mention Boyd's statement, and she testified that she looked into Lattimore because his description fit one they had received from witnesses to the murder, and because he was known to be a "hit man" for Curry.[9]

Baskerville later sought to vacate, set aside or correct his sentence,[10] raising more than two dozen claims. One claim was that the Government violated his due process rights under *Brady v. Maryland*[11] by failing to disclose the Boyd 302. The District Court denied most of Baskerville's claims, but held an evidentiary hearing on some, including the *Brady* claim arising from the Boyd 302. It later found that the Boyd 302 was not material under *Brady*, and therefore denied Baskerville's motion, but granted a certificate of appealability as to that claim only.

---

[9] App. 3411.

[10] 28 U.S.C. § 2255(a).

[11] 373 U.S. 83 (1963).

## II. [12]

Prosecutors have an absolute duty to disclose certain evidence to defendants.[13]  The Government violates this duty where:  (1) the evidence is favorable to the accused, *i.e.* it is exculpatory or impeaching; (2) the Government either intentionally or inadvertently suppressed the evidence; and (3) the suppression prejudiced the accused.[14]  Suppression is prejudicial if the evidence is material, meaning that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."[15]  A reasonable probability of a different result is one sufficient to undermine confidence in the outcome of the trial.[16]  Making this determination "is legally simple but factually complex," requiring us to consider the new evidence in light of the entire trial record.[17]

The Government concedes that the Boyd 302 was exculpatory and suppressed, satisfying *Brady*'s first two prongs.[18]  Therefore, the only question before this Court is

---

[12] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 2255.  We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253(a). Our review of factual findings is for clear error and we review legal conclusions *de novo*.  *United States v. Prophet*, 989 F.3d 231, 234 (3d Cir. 2021).

[13] *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 284, 290 (3d Cir. 2016) (en banc) (citing *Brady*, 373 U.S. at 83).

[14] *Id.*

[15] *Turner v. United States*, 137 S.Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).

[16] *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

[17] *Id.*

[18] Gov't Br. 24–25; App. 131–34.

whether the District Court erred in finding that the Boyd 302 was not material.  Baskerville argues the District Court made two principal errors in assessing the Boyd 302's materiality.[19]  First, that it incorrectly applied an admissibility requirement to *Brady* material, and second, that it erred in its materiality analysis.  Neither argument is availing.

**A.**

As to the alleged admissibility requirement, Baskerville correctly argues that evidence need not be admissible itself to qualify as *Brady* material.[20]  But the District Court did not apply an admissibility requirement here.  It correctly noted that "inadmissible evidence can be material if it could have led to the discovery of admissible evidence,"[21] and that although Boyd's statements were inadmissible hearsay, this "cannot end this Court's materiality inquiry" because "the overarching test is *materiality*, not admissibility."[22]  It found nothing in the record to suggest that Lattimore would have testified for Baskerville, or that his statements in the Boyd 302 would have otherwise been admissible under a hearsay exception.  Baskerville had also not identified what other admissible evidence disclosure of the Boyd 302 might have led to.  As the District Court correctly addressed the

---

[19] Portions of Baskerville's brief appear to address the notion that the Government violated his due process rights by procuring false testimony from Agent Manson.  As this is outside the certificate of appealability in this case, we decline to address these contentions.

[20] *Dennis*, 834 F.3d at 309–11.

[21] App. 137 (citing *Dennis*, 834 F.3d at 310).

[22] App. 137.

admissibility of the Boyd 302 and its potential to lead to admissible evidence in the context of *Brady* materiality, Baskerville's arguments to the contrary are meritless.

**B.**

Baskerville also claims the District Court erred by applying an incorrect materiality standard. He first argues that the District Court assessed whether the evidence was sufficient to convict with the suppressed 302 included, rather than assessing materiality.[23] But again, this mischaracterizes the District Court's opinion. It correctly noted that suppressed evidence that is cumulative of other evidence would not be material, and that although the Boyd 302 was not itself cumulative, the information within it was directly addressed at trial.[24] While the Boyd 302's assertion that Lattimore may have told another inmate that he shot someone in circumstances similar to McCray's murder was not itself before the jury, other evidence at trial also pointed to Lattimore. Agent Manson testified that she identified Lattimore as a suspect, that she believed Lattimore's "physical description fit that of one we had received from one of the witnesses," and that he was known to be a hit man for Curry.[25] But she testified that she investigated Lattimore not due to the Boyd 302, but because of a "best guess on [her] part."[26] The jury also heard from a law enforcement witness who performed a photo array for Davis, who had identified Lattimore's image. If

---

[23] Baskerville Br. 32-33.

[24] App. 134 (citing *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013)).

[25] App. 3411.

[26] App. 3411.

admissible in some form, the Boyd 302 would provide an additional reason to suspect Lattimore, but as the District Court correctly found, it was not the only such reason. This is not a sufficiency of the evidence approach. Rather than determining whether the jury had enough evidence to convict Baskerville even with the Boyd 302, the District Court correctly considered the Boyd 302 in the context of the entire trial record, as it must.[27] In this context, the Boyd 302 must be assessed against the other evidence already pointing to Lattimore, and the District Court did not err in making this determination.

Second, Baskerville argues he could have impeached Agent Manson's testimony with the Boyd 302. Agent Manson never mentioned the Boyd 302 as being a reason to suspect Lattimore, and therefore Baskerville claims that he could have used it to undermine the thoroughness of the investigation and to create a reasonable doubt in the minds of the jurors. The District Court found that any impeachment value of Agent Manson on this point would be limited, because she "was not the main witness who supplied evidence linking [Baskerville] to the murder of McCray."[28]

That witness was Young. He confessed to the murder, and extensively explained both why he did so and why he provided shifting versions of events. Young decided to cooperate after he had fallen out with other members of Curry's organization. He had told his then-girlfriend that in an attempt to murder a rival, Jamal Baskerville and Jamal McNeil had missed their intended target, shooting and killing an innocent bystander. Young's

---

[27] *Turner*, 137 S. Ct. at 1893.

[28] App. 136.

girlfriend told this to Jamal Baskerville's wife, who was a friend of hers, and she in turn told her husband. Jamal Baskerville, unhappy that Young was spreading this information, told Young he talked too much, and that he would be "taken care of" if Jamal Baskerville saw him in the street.[29] Young interpreted this as a threat against his life, and contacted the FBI for protection.

Young also explained why he told the FBI three separate versions of events. Before approaching the authorities, Young sought advice from counsel. Counsel told him not to implicate himself in whatever he told agents, so Young claimed merely to be present at the shooting, and that Jamal McNeil had shot McCray. At a subsequent meeting with prosecutors and the FBI, Young told agents another version of the events where he was not present. He altered his story because he was frustrated at not being released from jail. But finally, after receiving advice from a new lawyer, Young gave the version of events that implicated himself, the same version of events he gave at trial. This version of events required Young to confess to an offense that exposed him to a possible sentence of life in prison.

The Boyd 302 does not address any aspect of Young's testimony. While it may provide an additional reason to suspect Lattimore and supports an inference that Young was lying about his role to secure a favorable deal, Lattimore was mentioned at trial as a suspect and Young was cross examined about his deal with prosecutors. Only two pieces of evidence point to Lattimore as the gunman: the Boyd 302 and Davis's identification in

---

[29] App. 4007.

a photo array. Davis, who was only a few feet from his stepson at the time of the shooting, could only be "[t]hirty percent sure" that a photo of Lattimore resembled the gunman.[30] Even combined with the Boyd 302, this evidence is less than convincing in suggesting that Lattimore killed McCray.[31] Thus, any impeachment value from the Boyd 302 would be limited to Agent Manson, and would not impact the testimony of the main witness against Baskerville, Anthony Young.

Moreover, a number of Baskerville's fellow inmates testified at trial that he had discussed having his informant killed by his associates in the Curry organization. And Agent Manson testified that Lattimore was a hit man for the Curry organization. So implicating Lattimore with the Boyd 302 would not have helped Baskerville: The evidence would still have shown that a Curry organization hit man killed McCray and that Baskerville told his fellow inmates that he was working with the Curry organization to have McCray killed. Indeed, the prosecutor said during closing arguments that "it doesn't even matter legally whether the shooter was Anthony Young . . . or another member of the Curry organization, William Lattimore, perhaps," because "[l]egally it makes no difference," and

---

[30] App. 3929. This is consistent with testimony from Newark Police Detective Rashid Sabur, who testified that Davis was unable to make a positive identification because he could not be 100% sure that the picture of Lattimore was the same person who shot his stepson. App. 2966.

[31] *See Turner*, 137 S. Ct. at 1893 (holding that the impact of suppressed evidence must be considered against the record as a whole).

Baskerville's own lawyer agreed, saying during closing arguments that "it doesn't matter legally whether [Young] was the shooter or not."[32]

Against this background, there is no reason to believe that the result at Baskerville's trial would have been any different had the Boyd 302 been disclosed, and had Baskerville changed trial strategy to implicate Lattimore and challenge Young's credibility. Accordingly, the District Court did not err in concluding that the failure to disclose the Boyd 302 was not material. Thus, while there could have been some value to impeaching Agent Manson with the Boyd 302, it would not have revealed a new suspect for the jury, and would not have addressed Young's confession. We again agree with the District Court that the Boyd 302 would not have "seriously undermined the testimony of [Agent] Manson to make the Boyd 302 material under [an] impeachment theory."[33]

**III.**

For the foregoing reasons, we affirm the District Court's order denying Baskerville's motion to vacate or set aside his sentence.

---

[32] App. 4963, 5052.

[33] App. 136.

14